MANION, Circuit Judge,
dissenting.
The HHS accommodation is the long and winding extension cord the government uses to power its contraceptive mandate. It winds through regulations and additions and revisions. The court, through a perfunctory examination, interprets the accommodation’s twisted framework and holds that it frees the religious nonprofits from having to power the mandate themselves and, thus, does not violate the RFRA. The court is wrong: A thorough examination reveals that the accommodation’s tangled mess is hiding the fact that the extension cord gets its power from the nonprofits’ health plans and must be plugged in before it will work. It also exposes the fact that the government is forcing the nonprofits to plug in the accommodation themselves by signing the self-certification or providing the alternative notice.
This dissent, as long and detailed as it is, reveals that the accommodation never relieves the religious nonprofits or their health plans from the provision of contraceptive services which burdens their religious exercise. Section I explains how the court, as many others have before it, uses a caricature of the HHS accommodation to avoid accepting the nonprofits’ sincerely held religious belief as required by the Supreme Court in Burwell v. Hobby Lobby Stores, Inc., — U.S.-, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014). . Section II shows that the nonprofits correctly understand the accommodation’s operation, so that the court must accept their sincerely held religious belief and hold that the accommodation imposes a substantial burden on their religious exercise. Section III demonstrates that the government has utterly failed to prove that the HHS accommodation furthers a compelling governmental interest: The government has failed to establish any of the causal links necessary to prove that increasing the availability of contraceptive services will improve the health of women generally, let alone that of the nonprofits’ employees. Furthermore, the government’s stated interest is overbroad, underinclusive, and marginal at best. Section IV demonstrates that, even if the government had a compelling interest, the accommodation is not the least restrictive means. For these reasons, Section V concludes that the HHS accommodation violates RFRA, which means the nonprofits have a significant likelihood of success on the merits of their claim and the district court’s preliminary injunction should be affirmed. For the many reasons that follow, I dissent.
I. The court refuses to apply RFRA.
RFRA prevents the government from substantially burdening a person’s religious exercise unless the burden on the person is the least restrictive means of *809 furthering a compelling governmental interest. 42 U.S.C. § 2000bb-l. The Supreme Court has made it abundantly clear that courts are wholly incompetent to decide whether a governmental action burdens a person’s religious exercise. Rather, courts must accept a person’s sincere belief that it is a burden. Hobby Lobby, 134 S.Ct. at 2778-79. Courts determine whether the burden is substantial, but they do so by examining the level of coercion applied to compel compliance, not what is required by that compliance and to what extent it violates the person’s religion. Id. at 2779; Korte v. Sebelius, 735 F.3d 654, 683 (7th Cir.2013). Thus, the proper analysis is to determine first, that the nonprofits have a sincere belief that compliance with the law would violate their religion, and second, that the pressure applied by the government to coerce compliance with the law is substantial. The outcome of a thorough and proper analysis is ultimately simple and straightforward: As in Hobby Lobby, the government concedes the sincerely held religious belief and the fines imposed for noncompliance are “enormous.” Hobby Lobby, 134 S.Ct. at 2779. So, following Hobby Lobby, the accommodation imposes a substantial burden. That the government labels it. an accommodation makes no difference to the burden it imposes on the nonprofits. The analysis remains the same.
The court does not apply these straightforward steps because it balks at the idea that we must accept a person’s assertion that a law burdens their religion. The court fears that such a rule will allow a person to escape any number of regulations, including this brave new world of free and universal contraceptives, unless the government can meet the strict scrutiny test laid down by RFRA.[1] This was the same concern that prompted the Supreme Court’s decision to limit free exercise protections in Employment Div., Dept. of Human Resources of Ore. v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). Hobby Lobby, 134 S.Ct. at 2761-62. Nevertheless, when it enacted RFRA, Congress meant to restore exactly the level of protection to religious exercise that now so concerns the court. Id. at 2761-62; Korte, 735 F.3d at 671-72. So, foreclosed by the Supreme Court, the court rules as it and many others have before: The' court rejects the nonprofits’ sincere, belief that compliance with the HHS accommodation is prohibited by their religion.by holding that the nonprofits misunderstand the manner in which the accommodation operates. Then, acting as an expert theologian, the court holds that the accommodation’s operation as understood by the court is not a substantial burden to the nonprofits’ religious exercise.. Ante, at 807-08; see also Wheaton Coll. v. Burwell, 791 F.3d 792 (7th Cir.2015); Univ. of Notre Dame v. Burwell, 786 F.3d 606 (7th Cir.2015) (Notre Dame II); Michigan Catholic Conference v. Burwell, — F.3d-, 2015 WL 4979692 (6th Cir. Aug. 21, 2015); Little Sisters of the Poor Home for the Aged v. Burwell, 794 F.3d 1151 (10th Cir. Jul.14, 2015); East Texas Baptist Univ. v. Burwell, 793 F.3d 449 (5th Cir.2015); Geneva College v. Secretary United States Dep’t of Health & Human Servs., 778 F.3d 422 (3d Cir.2015); Priests for Life v. United States Dep’t of Health & Human Servs., 772 F.3d 229 (D.C.Cir.2014). But cf. Notre Dame II, 786 F.3d at 626 (Flaum, J., dissenting); Little Sisters, 794 F.3d at 1205-08 (Baldock, J., dissenting); Priests for Life v. United States HHS, 2015 U.S.App. LEXIS 8326, *16 (D.C.Cir. May 20, 2015) (en banc denied) (Brown,. J. *810 and Kavanaugh, J., dissenting); Eternal Word Television Network, Inc. v. Sec’y, U.S. Dep’t of Health & Human Servs., 756 F.3d 1339, 1340 (11th Cir.2014) (Pryor, J., concurring).
The court does this by improperly judging the nonprofits’ religious beliefs and ignoring the penalties used for compliance. Had the nonprofits said that they sincerely believe that the HHS accommodation violates their religion and left it at that, perhaps the injunction would remain in place because there would be nothing for the court to attack. But since the nonprofits said that they sincerely believe that the accommodation violates their religion because the accommodation makes them complicit in the provision of contraceptive services, the court has attacked their claim that the law makes them complicit. The court is right that it is “not required to defer to the plaintiffs’ beliefs about the operation of the law.” Ante, at 804. Nevertheless, it is the nonprofits that are right about the operation of the law, not the court.
II. The accommodation imposes a substantial burden on the nonprofits’ religious exercise.
The court denies that the self-certification and alternative notice process trigger the provision of contraceptive coverage. According to the court, it is federal law, not the self-certification form or alternative notice, which results in the contraceptive coverage. The court says that self-certification throws the burden of contraceptive coverage on to the nonprofits’ health insurance issuers (insurers) and third party administrators (TPAs). Ante, at 805. But how does this lift the burden off the nonprofits when the accommodation imposes the “free” contraceptive coverage requirement only on the insurers and TPAs that the nonprofits have hired? In spite of that imposition, the court also denies that the accommodation uses the nonprofits’ health plans to provide the contraceptive coverage. Instead, it says that the government contracts with the insurers and TPAs to provide the coverage to only the beneficiaries on the nonprofits’ health plans. Ante, at 806. But, given that connection with the nonprofits’ health plans, how can the provision of coverage be completely independent of those same plans?
The court can only make such sweeping claims by ignoring the true operation of the accommodation and the legal consequences the government has attached to the self-certification and alternative notice. The court may think that the nonprofits “throw” their burden onto their insurers and TPAs, but it ignores who is forced to do the throwing and who ultimately carries the burden once thrown. A close examination of the manner in which the regulations actually operate reveals that the government’s promise of accommodation is illusory. The nonprofits’ claim that the HHS accommodation makes them complicit in the provision of contraceptive coverage becomes obvious.

A. The self-certification form and alternative notice trigger the coverage of contraceptive services.

The court holds that the self-certification and alternative notice are simply signs that the nonprofits have opted out of providing contraceptive coverage, and once the sign is made known the law obliges the nonprofits’ insurers and TPAs to provide the unwanted coverage. Ante, at 805. In reality, once the nonprofits formally object, they are opted in. The self-certification and alternative notice do more than give notice of the nonprofits’ objections. And they are much more than de minimis paperwork necessary to effectuate the nonprofits’ objection. They create the insurers’ and TPAs’ obligation to provide the *811 contraceptive coverage.[2] For a nonprofit with a self-insured plan, the effect of the self-certification and alternative notice is abundantly clear: the government makes them legal instruments under which the nonprofit’s health plan is operated. This then allows the regulations to treat them as legal designations of the TPA as plan administrator and claims administrator for coverage of contraceptive services under the nonprofit’s health plan.[3] Only a nonprofit can designate its plan administrator.[4] The government’s ability to define how a plan administrator is designated does not give it the power to designate who will be a plan administrator.[5] For the TPA to have the necessary authority to provide coverage for contraceptive services, the nonprofit must designate the TPA as a plan administrator.[6] Such an act would obviously violate the nonprofit’s religion. So the government has loaded the self-certification and alternative notice with the legal significance of designating the TPA. It is not the operation of law. It is the acts of self-certification and alternative notice that designate the TPA and facilitate the provision of the unwanted contraception coverage. Without possession of the self-certification or alternative notice, the TPA cannot receive reimbursement for the provision of contraceptives.[7] In sum, the government can only require the nonprofits’ TPAs to cover contraceptive services if the nonprofits give the government the legal authority to do so. The government has hidden that legal authority in self-certification and alternative notice.
For insurers the situation is not as clear, but it is not the less burdensome. The law requires insurers to include contraceptive coverage in every health plan they offer.[8] (Insurers will not, however, provide something for which they are not paid.[9]) The self-certification and alternative notice permit an insurer to offer a health plan that appears not to include contraceptive coverage. But this is on the condition that the insurer still provides the coverage itself in the form of direct payments.[10] The asser *812 tion that it is the operation of law that designates an objecting nonprofit’s insurer as the replacement is misleading. It ignores the fact that but for the non-profit’s hiring of the insurer, and the nonprofit’s continuing contractual relationship with it, the government (or the operation of law) would not make any designation. Without the objection and designation by the nonprofits, the insurer is not required to act at all, despite the court’s claim to the contrary. The government has turned the act of objecting into the act of designating and it cannot escape the consequences of that conflation by calling-it an act of law.
This is not like the case of a conscientious objector who objects and the government finds a replacement. Under the regulations, the government does not find the replacement, the nonprofit does. The designation does not take place unless the nonprofit either delivers the self-certification form to its insurer or TPA, or uses the alternative notice to inform the government who its insurer or TPA is and which health plan is at issue. By insisting that the nonprofit deliver the form or supply the plan information for the government’s use, the, government uses the objecting nonprofit to do its dirty work. The government has not provided an exit — it offers a revolving door with only one .opening.[11]
Furthermore, this is not like the case of a conscientious objector who refuses to object and goes to jail, and the government still finds a replacement. If the nonprofits refuse to self-certify or provide the alternative notice and instead pay the huge fines, their insurers and TPAs will not automatically provide the contraception coverage. To comply with the law, the insurers would refuse to sell plans without the coverage, while the TPA would refuse to provide their services. In spite of the huge monetary penalties, the nonprofits would still be prevented from providing health plans for their employees, which they have asserted is also a violation of their religious beliefs. So the no-win substantial burden would hit them on both sides.
The court has implied that requiring the nonprofit to identify its insurer (or TPA) is merely the most efficient means for the government to achieve its objective, Wheaton, 791 F.3d at 798, but efficiency does not excuse the substantial burden imposed by the requirement. Identifying its insurer so that the government .can instruct that insurer to provide contraceptive coverage is just as burdensome to the nonprofit as if it had to pick its own replacement, because it has done just that by hiring its insurer and then objecting to the coverage requirement. That the nonprofits could not object if the government, on its own, were to find a replacement insurer and discover to which employees it had to provide the coverage is not relevant. Of course the nonprofits would not have an objection to the government contracting with a third party to provide the contraceptive coverage to other third parties. They believe the provision of objectionable contraceptives is always immoral, but they know they have no legal means to stop the government from contracting with third parties. That is not what is happening here. The government is using the nonprofits, their health plans, and their con *813 tractual relationships with their insurers and TPAs, to provide the contraception coverage to which they object.

B. The accommodation uses the non-proñts’ health plans.

The HHS accommodation requires significantly more involvement on the part of the nonprofits and their health plans than the court relates. For starters, the accommodation does not create independent policies or contracts. In fact, as the nonprofits assert, the accommodation relies wholly on the existing contract between the nonprofits and the insurers and TPAs to provide separate payments directly to the nonprofits’ health plan beneficiaries.[12] The accommodation must use the existing insurance contracts to issue payments because separate policies would violate insurance laws.[13] The separate payments are only provided so long as an employee is enrolled in the nonprofit’s health plan, thus requiring the nonprofits’ health plans to determine eligibility.[14] The accommodation also relies on the nonprofits’ health plans’ enrollment procedures. The insurers and TPAs must provide notice of the separate payments when they provide notice of the other benefits under the nonprofits’ health plans.[15] The separate payments can be limited to the same provider network as the other plan benefits.[16] The end result is that the contraceptive services become a de facto benefit under the nonprofits’ health plans.[17] The government admitted as much when it stated that it was by design that the accommodation makes the provision of contraceptive coverage “seamless[]” with the other plan benefits. Gov’t Supp and Reply Br., 14. These circumstances sharply conflict with the court’s conclusion that the accommodation does not use the nonprofits’ health plans and “makes every effort to separate religious employers from the provision of any objectionable services.” Ante, at 800. “[Ejvery effort” does not disguise the fact that the offensive provision is inseparably imbedded in the nonprofits’ health plan. Id.
A further indication that the accommodation uses the nonprofits’ health plans is the fact that the only way an employee receives coverage for contraceptive services under the accommodation is to enroll *814 in the objecting nonprofit’s health plan. An employee cannot reject coverage under the nonprofit’s plan and still receive coverage under the accommodation. The coverage under the accommodation is not separate from the coverage under the nonprofit’s health plan. It is the employee’s status as a beneficiary of the nonprofit’s health plan, not as an employee, that entitles the employee to coverage under the accommodation. Simply being hired as an employee is not enough to receive coverage; an employee must enroll in the nonprofit’s health plan. Cf. Notre Dame II, 786 F.3d at 617.

C. The nonprofits are involved in the payment for contraceptive services.

Finally, there is the matter of payment. For TPAs, the self-certification and alternative notice act as authorizations for payment, without which the TPAs cannot receive reimbursement from the government for payments made under the accommodation.[18] The government assumed that the reimbursements for TPAs would not be passed on to the non-profits but, as more nonprofits are forced to use the accommodation and more contraceptive services are provided under the accommodation, that assumption is unlikely to prove true.[19] For insurers there is ostensibly no reimbursement because the government claims the cost of contraceptive services will be offset by the reduction in unintended pregnancies.[20] Whether this claim is true will be hard to determine because the regulations allow insurers to recapture costs for contraceptive services provided under the accommodation through what is called the “risk corridor program.”[21] The program *815 is temporary, but since the HHS accommodation was enacted during the program’s implementation, it will be difficult to determine how the accommodation’s separate payments affect premiums. Nevertheless, if it were true that payments for contraceptive services are cost-neutral, then the premiums that would otherwise go toward childbirths are instead used for contraceptive services in order to reduce childbirths because the nonprofits’ premiums are the only source of funding. This is also an objectionable outcome.

D. The proper substantial burden analysis: the court must accept the nonprofits’ sincere belief that the accommodation violates their religion because the nonproñts understand its operation.

. The HHS accommodation is a purposely complicated act of bureaucratic legalese and accounting tricks that enables the government to claim that the objecting nonprofits have nothing to do with the provision of contraceptive services. Yet, as shown in much detail above, the accommodation infects the nonprofits’ health plans with an offensive provision that eradicates their purpose, which is the exercise of the nonprofits’ religion. It is the nonprofits which understand the operation of the HHS accommodation, not the court, and we must accept their sincere belief that it violates their religion. The accommodation imposes a substantial burden because the nonprofits have a sincere belief that compliance with the law violates their religion and the penalties applied by the government to coerce compliance are enormous.
III. The accommodation does not further a compelling governmental interest.
The government must grant the nonprofits an exemption from The accommodation unless “it demonstrates that applica *816 tion of the burden to the person — (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.” 42 U.S.C. § 2000bb-1 (emphasis added). “This requires us to look beyond broadly formulated interests and to scrutinize the asserted harm of granting specific exemptions to particular religious claimants — in other words, to look to the marginal interest in enforcing the contraceptive mandate in these cases.” Hobby Lobby, 134 S.Ct. at 2779 (internal quotation and alteration marks omitted). “RFRA creates a broad statutory right to case-specific exemptions from laws that substantially burden religious exercise even if the law is neutral and generally applicable, unless the government can satisfy the compelling-interest test.” Korte, 785 F.3d at 671. “In short, RFRA operates as a kind of utility remedy for the inevitable clashes between religious freedom and the realities of the modern welfare state, which regulates pervasively and touches nearly every aspect of social and economic life.” Id. at 673.
“Congress’s express decision to legislate the compelling interest test indicates that RFRA challenges should be adjudicated in the same manner as constitutionally mandated applications of the test....” Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 430, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006). Thus, the government-“must specifically identify an ‘actual problem’ in need of solving, and the curtailment of [the right] must be actually necessary to the solution.” Brown v. Entm’t Merchs. Ass’n, — U.S.-, 131 S.Ct. 2729, 2738, 180 L.Ed.2d 708 (2011) (citation omitted). This requires a “high degree of necessity.” Id. at 2741. The government must show a “direct causal link.” . Id. at 2738. The government’s “predictive judgment” is insufficient, “and because it bears the burden of uncertainty, ambiguous proof will not suffice.” Id. at 2738-39. (citation omitted). The government must prove that what it seeks to regulate actually causes the harm it wishes to prevent; evidence of a correlation is insufficient. Id. at 2739. “[S]tudies [that] suffer from significant, admitted flaws in methodology” fail to provide this proof. Id. If the regulation is underinelusive it is a sign that the governmental interest is not compelling. Id. at 2740. Put another way, “only those interests of the highest order and those not otherwise served” can be considered compelling. Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). But, “a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited.” Church of Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 547, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (internal quotation and alteration marks omitted). Finally, the government does not have a compelling interest in “Milling the remaining modest gap” or in “each marginal percentage point by which its goals are advanced.” Brown, 131 S.Ct. at 2741, n. 9.
The government asserts the same interest in furtherance of the HHS accommodation that it asserts in furtherance of the HHS contraceptive mandate, namely, the increased availability of contraceptive services to improve the health of women. The government also says that it wishes to increase the availability of contraceptive services to equalize the provision of preventive care for women and men so that women can participate in the workforce and society on an “equal playing field with men.” The latter interest boils down to a concern for women’s health. The government claims that the inequality stems from the additional cost of contraception and that the additional cost can deter women from using contraceptives, thus allowing the negative health outcomes that prevent *817 women from achieving equal economic status. 77 FecLReg. 8728.
To justify increasing the availability of contraception to improve the health of women, the government relies exclusively on the Institute of Medicine’s 2011 study, Clinical Preventive Services for Women: Closing the Gaps (IOM Study). The IOM Study is a 235-page study of the current preventative services available for women. Only eight pages of the study deal with the issue of contraceptive services. IOM Study, 102-09. The study does not claim that contraceptives improve women’s health generally, but that they prevent certain negative health outcomes associated with unintended pregnancies. See Priests for Life, 772 F.3d at 261 (“A core reason the government sought under the ACA to expand access to contraception is that use of contraceptives reduces unintended pregnancies.”). The government’s interest advanced by the accommodation, then, is best identified as increasing the availability of contraceptive services in order to prevent the negative health outcomes caused with unintended pregnancies. When put to the test, the government’s interest fails to prove compelling.[22]

A. A lack of available contraception and unintended pregnancies are not actual problems in need of solving.

The HHS accommodation relies on a lengthy chain of causality: 1) the accommodation will make contraceptives more available by removing administrative and cost burdens; 2) if contraceptives are more available, then more women will use them; 3) if more women use contraceptives, then there will be fewer unintended pregnancies; and 4) if there are fewer unintended pregnancies, then there will be fewer of the negative health outcomes associated with them. The government, therefore, must prove more than the existence of negative health outcomes. It must prove first, that unintended pregnancies cause the negative outcomes; second, that contraceptive use will cause fewer unintended pregnancies; and third a higher availability of contraceptives will cause more women to use them. The IOM Study fails to prove these “direct casual links.” Brown, 131 S.Ct. at 2738. Instead, the study shows merely a correlation.
First, the study admits that “for some outcomes [of unintended pregnancy], research is limited.” Id. at 103. It then proceeds to describe the outcomes correlated with unintended pregnancies: outcomes that “may” or “may not” happen, are “more” or “less likely,” have been “reported,” and have “increased odds,” or are “associated with.” IOM Study 103.
Second, the study discusses “evidence of [contraceptive] method effectiveness,” but does not prove that increasing the use of even an effective contraceptive causes fewer unintended pregnancies. This is because such a simple correlation does not take into account the factors that inhibit perfect use of contraception or the societal changes that result from increased reliance on contraception.[23] Rather than *818 prove that greater contraceptive use causes fewer unintended pregnancies, the study only states that “evidence exists” that it does. Id. at 105. The IOM study bases this statement on two other studies, but they are insufficient to provide the necessary evidence.[24] According to the study, “[ijt is thought that greater use of long-acting, reversible contraceptive methods — including intrauterine devices and contraceptive implants that require less action by the woman and therefore have lower use failure rates — might help further reduce unintended pregnancy rates.” Id. at 108 (emphasis added; citation omitted).
Third, the study fails to prove that increasing the availability of contraceptives will cause an increase in their use, but concludes that “[t]he elimination of cost sharing for,contraception therefore could greatly increase its use, including use of the more effective and longer-acting methods, especially among poor and low-income women most at risk for unintended pregnancy.” IOM Study, 109 (emphasis added). However, the conclusion that eliminating cost sharing “could” increase its use is based on two studies, neither of which concerned contraceptive services specifically. The first, concerned preventative and primary care services generally, and the second concerned mammograms. Id. The final claim the study makes is that “when out-of-pocket costs for contraceptives were eliminated or reduced, women were more likely to rely on more effective long-acting contraceptive methods.” Id. But, a review of the study underlying that conclusion reveals that “[w]e cannot be certain that the changes in procurement were solely due to the removal of cost to the patient, but there was a shift toward prescribing the most effective methods ( [intrauterine contraceptives] and injectable contraceptives) and a substantial increase in prescribing of [emergency contraceptive pills].”[25] So, not only was the study inconclusive, it is ambiguous regarding the IOM Study’s intended purpose because a substantial increase in emergency contraceptive pills would seem to follow from a decrease in regular contraceptive use. On the whole, the IOM study’s lack of causality renders the government’s claim that it must increase the availability of contraceptives nothing more than a “predictive judgment.” Brown, 131 S.Ct. at 2738.
Another reason the IOM Study fails to prove “an ‘actual problem’ in need of solving” is because it is overbroad. Brown, 131 S.Ct. at 2738. The study starts with the estimation that “[i]n 2001, ... 49 percent of all pregnancies in the United States were unintended,” but the study defines an unintended pregnancy as one that is “unwanted or mistimed at the time of conception.” IOM Study, 102. This definition includes pregnancies that were unwanted at the time of conception, but still wanted when' the mother discovered she was pregnant, and mothers who intended to become pregnant, but did not intend to become pregnant by the specific conjugal act that resulted in conception. The government has zero interest in preventing these pregnancies. Under the study’s overbroad definition, “all sexually active women with reproductive capacity are at risk for unintended pregnancy.” Id. at 103. Aside from the study’s problems with its own definition, unintended pregnancies are an extremely difficult thing to quantify.[26]
*819 Overall, the IOM Study lacks the necessary quality and rigor. It heavily relies on studies from biased organizations, such as the Guttmacher Institute and the journal CONTRACEPTION, and offers no consideration of competing studies. Id. at 102-109. The study’s own dissenting opinion says it best:
Readers of the Report should be clear on the fact that the recommendations were made without high quality, systematic evidence of the preventive nature of the services considered. Put differently, evidence that use of the services in question leads to lower rates of disability or disease and increased rates of well being is generally absent.
The view of this dissent is that the committee process for evaluation of the evidence lacked transparency and was largely subject to the preferences of the committee’s composition. Troublingly, the process tended to result in a mix of objective and subjective determinations filtered through a lens of advocacy. An abiding principle in the evaluation of the evidence and the recommendations put forth as a consequence should be transparency and strict objectivity, but the committee failed to demonstrate these principles in the Report. This dissent views the evidence evaluation process as a fatal flaw of the Report particularly in light of the importance of the recommendations for public policy and the number of individuals, both men and women, that will be affected.
IOM Study, 232-33.
The study itself shows that the lack of available contraceptive services is not a problem in need of solving. According to the IOM Study, “[cjontraceptive coverage has become standard practice for most private insurance and federally funded insurance programs.” Id. at 108. Further, “[sjince 1972, Medicaid, the state-federal program for certain low-income individuals, has required coverage for family planning in all state programs and has exempted family planning services and supplies from cost-sharing requirements.” Id. Finally,
[Cjomprehensive coverage of contraceptive services and supplies [is] “the current insurance industry standard,” with more than 89 percent of insurance plans covering contraceptive methods in 2002. A more recent 2010 survey of employers found that 85 percent of large employers and 62 of small employers offered coverage of FDA-approved contraceptives.
Id. at 109 (citations omitted). Not only are contraceptive services already widely available, but they are also already widely used: “More than 99 percent of U.S. women aged 15 to 44 years who have ever had sexual intercourse with a male have used at least one contraceptive method.” IOM Study, 103 (citation omitted). According to the Centers for Disease Control and Prevention, contraceptive use is “virtually universal among women of reproductive age.”[27]
The study similarly fails to prove that there is a need to increase the availability of contraceptives to alleviate “the increased risk of adverse pregnancy outcomes for pregnancies that are too closely spaced” or for “women with certain chronic medical conditions” who “may need to postpone pregnancy” and “women with serious medical conditions” for whom “pregnancy may be contraindicated.” IOM Study, 103. Amazingly, the study does not even pretend to demonstrate a causal link in these circumstances, relying instead on the reader to make the inference mistakenly. The study hopes the *820 reader ignores the common sense fact that women in these circumstances have a higher incentive to use contraceptives if that is their chosen method to prevent these outcomes.
The study offers no evidence regarding the effects that extra paperwork or other administrative and logistical obstacles would have on contraceptive availability or use. Such a finding is absolutely necessary for the government to assert that it has a compelling interest in using the nonprofits’ health plans so that the coverage for contraceptive services will be “seamless.” Instead, the IOM Study’s conclusions are limited to the elimination of cost-sharing and provide no reason why a government-run option would not work equally as well as the HHS accommodation.
Finally, the IOM Study does not concern the employees of the nonprofits who are less likely to use contraception given their own religious beliefs, instead, its conclusions mostly concern the “poor and low-income women most at risk for unintended pregnancy.” Id. at 109. The study’s hope is that the elimination of cost sharing for contraception will induce the poor to use more effective, long-acting methods, such as IUDs, implants, and sterilization. Id. at 108-109. However, “the government must establish a compelling and specific justification for burdening these claimants.” Korte, 735 F.3d at 685; see also Hobby Lobby, 134 S.Ct. at 2761. The IOM Study fails to prove any connection whatsoever with the nonprofits’ employees. In fact, there are already a high level of access to contraception, a higher rate of use, and an increased use of more effective methods among the women with more income and education.[28] Simply put, the IOM study fails to “specifically identify an ‘actual problem’ in need of solving,” and, consequently, the government has failed to demonstrate a compelling interest. Brown, 131 S.Ct. at 2738.

B. The accommodation is underin-clusive.

The HHS accommodation’s underinclusiveness is another sign that the governmental interest is not compelling. Id. at 2740. The government “leaves appreciable damage to that supposedly vital interest unprohibited” by allowing religious employers, grandfathered plans, and employers with fewer than 50 employees to avoid providing contraceptive coverage. Lukumi, 508 U.S. at 547, 113 S.Ct. 2217 (internal quotation marks omitted). Although moré health plans will lose their grandfathered status the longer the ACA is in place, the number of persons employed by religious employers and organizations with fewer than 50 employees will remain considerable in light of the less than 2,000 covered employees concerned here.
The accommodation is also underinclu-sive because it does not account for the other causes of the negative health outcomes the IOM Study correlates with unintended pregnancies. According to the study, “women with unintended pregnancies are more likely than those with intended pregnancies to receive later or no prenatal care, to smoke and consume alcohol during pregnancy, to be depressed during pregnancy, and to experience domestic violence during pregnancy.” IOM Study, 103. The study implies that unintended pregnancies cause these conditions, but there could just as well be another cause that causes not only these conditions, but the unintended pregnancy as well: poverty, lack of education, abuse, or other causes of risk taking behaviors. The HHS accommodation addresses none of these alternative causes, focusing solely on unintended pregnancies. Most notably, *821 the study does not acknowledge the fact that pregnancies resulting from failed contraceptives are also considered unintended.
Most damaging to the government’s asserted interest in the contraceptive mandate is the fact that those women most at risk for an unintended pregnancy are “women who are aged 18 to 24 years and unmarried, who have a low income, who are not high school graduates, and who are members of a racial or ethnic minority group.” IOM Study, 102 (citation omitted). These women — let alone the nonprofits’ employees — are less likely to be served by the HHS accommodation, or the ACA’s contraception mandate generally, because they are less likely to have the type of employment that qualifies them for the health insurance under the ACA. These women would not obtain contraceptive services through the HHS accommodation, but through a number of government programs such as Medicaid, 42 U.S.C. § 1396 et seq. (2010), and the Title X Family Planning Program, 42 U.S.C. § 300 (2006). “The consequence is that [the HHS accommodation] is wildly under-inclusive when judged against its asserted justification, which ... is alone enough to defeat it.” Brown, 131 S.Ct. at 2740.

C. Forcing nonprofíts to use the accommodation can only provide a marginal increase in contraception.

Contraceptive services are already widely available and their use is virtually universal. The HHS accommodation only fills the “remaining modest gap” by making already prevalent contraceptive services free for employees of religious nonprofits. Id. at 2741. This “can hardly be a compelling state interest.” Id. Further, the “more focused inquiry” of RFRA requires the government to demonstrate that it has a compelling interest in filling the gap made by the less than 2,000 employees of the nonprofits here. Hobby Lobby, 134 S.Ct. at 2779. This is even less of a compelling interest. Further still, the accommodation fills in even less of the gap when viewed from the perspective of unintended pregnancies. This is because the accommodation seeks to treat unintended pregnancies through contraceptive services, but contraceptives are not always effective for a variety of reasons. Even if this gap could be decreased by improving the effectiveness of contraceptives, “the government does not have a compelling interest in each marginal percentage point by which its goals are advanced.” Brown, 131 S.Ct. at 2741, n. 9.

D. A primary concern underlying the accommodation is cost.

Cost appears to be a primary concern underlying the HHS accommodation. After all, babies are expensive. Of the IOM Study’s eight-page discussion of contraceptives, a significant portion is spent on the cost savings to be expected from their use despite the study’s acknowledgement that cost considerations are out of scope:
Although it is beyond the scope of the committee’s consideration, it should be noted that contraception is highly cost-effective. The direct 'medical cost of unintended pregnancy in the United States was estimated to be nearly $5 billion in 2002, with the cost savings due to contraceptive use estimated to be $19.3 billion.... It is thought that greater use of long-acting, reversible contraceptive methods — including intrauterine devices and contraceptive implants that require less action by the woman and therefore have lower use failure rates — might help further reduce unintended pregnancy rates. Cost barriers to use of the most effective contraceptive methods are important because long-acting, reversible contraceptive methods and sterilization have high upfront costs.
*822 IOM Study, '107-08 (citations omitted). The study’s primary conclusion is that the use of contraceptive services — particularly longer-acting methods like IUDs — will greatly increase if they are free, “especially among poor and low-income women.” Id. at 109 (emphasis added). The appearance is that the government desires to use contraceptives that “require less action by the woman” to prevent poor, unmarried, minority women from having babies, as if babies were a costly disease. IOM Study, 108. Of course, this appearance is lessened by the fact that the government is vigorously enforcing the HHS contraception mandate on even religious nonprofits through the accommodation.
Because the government has failed to prove that the HHS accommodation furthers a compelling governmental interest, it is not allowed to burden the nonprofits’ religious exercise with the accommodation. 42 U.S.C. § 2000bb-l. Thus, the government must grant the nonprofits the same exemption that it grants to religious employers. 45 C.F.R. § 147.131(a).
IV. The accommodation is not the least restrictive means.
Even if the government had proved that the HHS accommodation was in furtherance of a compelling interest, it would still have to grant the nonprofits’ an exemption from the accommodation because the accommodation is not the least restrictive means. 42 U.S.C. § 2000bb-l(b)(2). The Supreme Court in Hobby Lobby spoke of an obvious means that would be less restrictive than the HHS accommodation:
The most straightforward way of doing this would be for the Government to assume the cost of providing the [objectionable] contraceptives at issue to any women who are unable to obtain them under their health-insurance policies due to their employers’ religious objections. This would certainly be less restrictive of the plaintiffs’ religious liberty, and HHS has not shown ... that this is not a viable alternative.
134 S.Ct. at 2780. The government argues ’ that RFRA does not require the government to create entirely new programs to accommodate religious objections, but the government provides no authority for its position. The Court did not hold that it was so in Hobby Lobby. Id. at 2786. Rather, the Court stated that Congress understood that by passing RFRA it might cost the government extra to avoid burdening religion. Id. at 2781. Besides, the government already maintains programs, such as Medicaid and the Title X Family Planning Program mentioned earlier, which could be opened up to the employees of the nonprofits.
The government also argues that a government-run program is not a valid means because it would create additional burdens for the nonprofits’ employees and RFRA does not protect religious exercise that “unduly restricts] other persons, such as employees, in protecting their own interests, interests the law deems compelling.” Id. at 2786-87 (Kennedy, J., concurring). This requirement is not found in RFRA. What the government fails to acknowledge is that the purpose of an inquiry into the burdens on others is to determine whether a particular religious accommodation violates the Establishment Clause. See Cutter v. Wilkinson, 544 U.S. 709, 719-20, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) (Ginsburg, J.). To determine whether a religious accommodation under RFRA is compatible with the Establishment Clause “courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries, and they must be satisfied that the Act’s prescriptions are and will be administered neutrally among different faiths.” Id. at 712, 125 S.Ct. 2113 (citation omitted). A religious accommodation’s effect on third parties must be examined because “[a]t some point, accom *823 modation may devolve into ‘an unlawful fostering of religion.’ ” Id. at 714, 125 S.Ct. 2113 (quoting Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 334-335, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987)). The Supreme Court “has long recognized that the government may ... accommodate religious practices ... without violating the Establishment Clause.” Id. at 713, 125 S.Ct. 2113 (quoting Hobbie v. Unemployment Appeals Comm’n of Fla., 480 U.S. 136, 144-145, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987)).
Administering a government-run program for contraceptive coverage in order to relieve the nonprofits of the burden on their religion imposed by the accommodation would not “devolve into ‘an unlawful fostering of religion.’ ” Id. at 714, 125 S.Ct. 2113. A government-run program would provide the contraception coverage on a cost-free basis. Any burden resulting from an employee’s participation in the program would be de minimis because it truly would be nothing more than additional paperwork (unlike the self-certification and alternative notice). Furthermore, such a small burden would be no different than the burden experienced by the many who obtain dental and vision care benefits from different plans and fill their prescriptions at pharmacies unassociated with their health care providers. It would be absurd to say that such a de minimis burden even came close to the establishment of religion. Finally, any burden would be within the employee’s power to avoid by changing employment to an employer that provides the coverage. According to the government, when the contraceptive services mandate was enacted, 85% percent of large employers and 62% percent of small employers already covered contraceptives services under the health plans. Even more plans will cover contraceptives and that coverage will be copayment-free now that the mandate is in force.
V. Conclusion
This dissent explores the road less traveled by. As detailed above, the detour exposes two serious misrepresentations. First, the so-called accommodation is nothing but a mirage. The government strung together the complicated details to create a lengthy and twisted extension cord. The end result is the de facto imposition of a provision offering “free” birth control into the nonprofits’ necessary health plans. The unwanted provision is very offensive and contrary to the nonprofits’ sincerely held religious beliefs. The imposition does not occur if the nonprofits refuse to plug in the extension cord by refusing to self-certify or otherwise indicate consent through the alternative notice. But this refusal causes enormous, existential monetary penalties. So, there are substantial burdens at both ends of the accommodation.
Second, deep into the detour is the falsehood behind the government’s claim that increasing the availability of contraceptive services furthers a “compelling governmental interest.” That label is needed to overcome the nonprofits’ sincerely held religious beliefs that no one disputes. But, contraceptive services are already widely available from the great majority of employers. And, for the primarily targeted poor and/or unemployed women, whom the mandate does not affect, there are already programs like Medicaid and Title X that offer free contraceptive services. At its center, the IOM Study recognizes that babies are medically very expensive, so the government endeavors to reduce “unexpected” pregnancies to save money. In effect, the government considers pregnancy a preventable disease.
*824 Aside from the fact that the government desires to substantially burden the nonprofits’ religious exercise in furtherance of an exaggerated, misnamed, and misdirected interest, there are, no doubt, less restrictive means of furthering its interest. But why even go there? The government certainly has no compelling interest in forcing contraceptive coverage into the nonprofits’ otherwise wanted and needed health plans when they unanimously assert they don’t want the coverage and don’t need it. The obvious solution for these plaintiffs (and likely for the plaintiffs involved in the similar — and similarly expensive — litigation in at least six other federal circuits, see supra p. 792) is for the government to extend the religious employer exemption to all religious nonprofits that object to the coverage. 45 C.F.R. § 147.131(a).'
The nonprofits have shown a likelihood of success on their claims that the HHS accommodation violates RFRA. 42 U.S.C. § 2000bb-l. The preliminary injunction granted by the district court should be affirmed. Korte, 735 F.3d at 666 (“Although the claim is statutory, RFRA protects First Amendment free-exercise rights, and in First Amendment cases, the likelihood of success on the merits will often be the determinative factor.” (internal quotation marks omitted)).
For all these reasons, I dissent.

. What goes unsaid by this critique is the conclusion that the nonprofits' religious beliefs are less deserving of protection than the government's scheme to marginally increase the availability of contraceptive services for certain employees.

. 45 C.F.R. § 147.131 (c)(2)(i) ("A group health insurance issuer that receives a copy of the self-certification or notification ... must ... [plrovide separate payments for any contraceptive services for plan participants and beneficiaries for so long as they remain enrolled in the plan.” (emphasis added)); 29 C.F.R. § 2590.715-2713A(c)(2)(i) (identical requirement for TPAs); 78 Fed.Reg. 39878 (listing among the key elements of the accommodation the need for eligible organizations with insured group health plans to self-certify and that it is the "issuer that receives a self-certification” that must comply with the accommodation’s requirements); 78 Fed.Reg. 39880 ("A third party administrator that receives a copy of the self-certification ... must provide or arrange separate payments for contraceptive services....”).

. 78 Fed.Reg. 39879 ("The self-certification ... will be treated as a designation of the third party administrator(s) as plan administrator and claims administrator for contraceptive benefits pursuant to section 3(16) of ERISA.”); 29 C.F.R. § 2510.3-16 (defining the term plan administrator to include the regulatory treatment of the self-certification and alternative notice as acts of designation and declaring that each "shall be an instrument under which the plan is operated”).

. 29U.S.C. § 1102(a)(2).

. 29 U.S.C. § 1002(16)(A).

. 78 Fed.Reg. 39880 ("The third party administrator serving as the plan administrator for contraceptive benefits ensures that'there is a party with legal authority to arrange for payments for contraceptive services and administer claims in accordance with ERISA’s protections for plan participants and beneficiaries.”).

. See infra note 18.

. 45 C.F.R. § 147.131(a)(1).

. See infra note 21.

. See supra note 2.

. This is not the case of a conscientious objector walking into the draft board, voicing his objection, being excused, and walking out. For the analogy to fit the HHS accommodation, the draft board must decide that every objector will be replaced by the objector's friend, and the objector’s objection is only effective if the objector delivers written notice of his objection to his friend or tells the draft board who his friend is and where the board can find him. Then, the objector must send his friend money so that that his friend will remain his friend for the purpose of being his replacement.

. 78 Fed.Reg. 39874 ("[T]he accommodations established under these final regulations do not require the issuance of a separate excepted benefits individual health insurance policy covering contraceptive services ... but instead require a simpler method of providing direct payments for contraceptive services.” (emphasis added)).

. 78 Fed.Reg. 39876 ("As the payments at issue derive solely from a federal regulatory requirement, not a health insurance policy, they do not implicate issues such as issuer licensing and product approval requirements under state law ... ”).

. 45 C.F.R. § 147.131 (c)(2)(i)(B) (insurers must ‘‘[pjrovide separate payments for any contraceptive services ... for plan participants and beneficiaries for so long as they remain enrolled in the plan.”); 29 C.F.R. § 2590.715-2713A(c)(2)(i)(B) (identical regulatory requirements for TPAs).

. 78 Fed.Reg. 39881 (“The notice [regarding the provision of contraceptive services] must be provided contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in cover-age_” (emphasis added)).

. 78 Fed.Reg. 39877 ("[A]n issuer ... may require that contraceptive services be obtained in-network (if an issuer has a network of providers) in order for plan participants and beneficiaries to obtain such services without cost sharing.” (emphasis added)).

. 78 Fed.Reg. 39880 ("[T]he self-certification ... identifies the limited set of plan benefits (that is, contraceptive .coverage) that the employer refuses to provide and that the third party administrator must therefore provide or arrange for an issuer or another entity to provide.” (emphasis added)).

.Payments for contraceptive services provided by TPAs under the HHS accommodation are funded through an adjustment (i.e., discount) to the federally-facilitated exchange (FFE) user fee. See 78 Fed.Reg. 39882. The FFE user fee is paid by insurance issuers that participate in a federal health care exchange to support the operations of the exchange. See 78 Fed.Reg. 15412; 45 C.F.R. § 156.50(c). The amount of the adjustment is equal to the total amount of the payments made for contraceptive services provided by the TPA plus an allowance of at least 10 percent for administrative costs. 45 C.F.R. § 156.50(d)(3). To receive the FFE user fee adjustment, a TPA must submit to HHS ''[a]n attestation that the payments for contraceptive services were made in compliance with 26 CFR 54.9815-2713A(b)(2) or 29 CFR 2590.715-2713A(b)(2).” 45 CFR § 156.50(d)(2)(iii)(E). Both the provisions cited by § 156.50 provide that the TPA will provide the separate payments for contraceptive services "[i]f a third party administrator receives a copy of the self-certification from an eligible organization or a notification.” 26 CFR § 54.9815v2713AT(b)(2) and 29 CFR § 2590.715-2713A(b)(2). Moreover, § 156.50 requires a TPA which receives an adjustment to maintain for 10 years and make available upon request "[a] copy of the self-certification referenced in 26 CFR 54.9815-2713A(a)(4) or 29 CFR 2590.715-2713A(a)(4) for each self-insured plan with respect to which an adjustment is received.” 45 CFR § 156.50(d)(7)(i).

. The government assumed that the adjustments granted under the accommodation for 2014 would be small enough to have no impact on the fee. 78 Fed.Reg. 39882. However, the FFE user fee will have to be increased to cover 1) more adjustments as more nonprofits are forced to take advantage of this accommodation, and 2) greater adjustments because the HHS mandate incentivizes more expensive forms of contraception. An increase in the FFE user fee will eventually be recouped through an increase in premiums, albeit an increase across the insurance issuer's entire portfolio, but the nonprofits may be in that same portfolio.

. 78 Fed.Reg. 39877 ("The Departments continue to believe, and have evidence to support, that, with respect to the accommodation for insured coverage established under these final regulations, providing payments for contraceptive services is cost neutral for issuers.”).

. 78 Fed.Reg. 39878 ("[A]n issuer of group health insurance coverage that makes pay *815 ments for contraceptive services under these final regulations may treat those payments as an adjustment to claims costs for purposes of medical loss ratio and risk corridor program calculations. This adjustment compensates for any increase in incurred claims associated with making payments for contraceptive services.”). The "risk corridor program” is a complex cost-sharing program in which insurers with healthier beneficiaries cover the costs of insurers which either failed to raise premiums or could not raise premiums enough to cover more costly beneficiaries, including those that received separate payments for contraceptive services. See 45 C.F.R. § 153.500 et seq.; 78 Fed.Reg. 7235 ("Section 1342 of the Affordable Care Act directs the Secretary to establish a temporary risk corridors program that provides for the sharing in gains or losses resulting from inaccurate rate setting from 2014 through 2016 between the Federal government and certain participating plans.”); see also 78 Fed.Reg. 72323 ("In 2014, HHS will also operationalize the premium stabilization programs established by the Affordable Care Act — the risk adjustment, reinsurance, and risk corridors programs — which are intended to mitigate the impact of possible adverse selection and stabilize the price of health insurance in the individual and small group markets.”). The program is supposed to pay for itself, but the regulations allow the government to use appropriated funds to cover insurer loses. See 79 Fed.Reg. 30260 ("In the unlikely event of a shortfall for the 2015 program year, HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers. In that event, HHS will use other sources of funding for the risk corridors payments, subject to the availability of appropriations.”). Perhaps this is why insurers do not object to the HHS accommodation. Insurers know that the federal government will ultimately bear the burden of covering the costs for contraceptive services they are unable to recoup. The risk corridor program has been ■criticized as a health insurer bailout program. See Noam N. Levey, Critics call Obama funding plan for health insurer losses a ‘bailout,’ L.A. TIMES, May 21, 2014, http://www. latimes.com/nation/lana-insurance-bailout-20140521-story.html (last visited Sept. 3, 2015).

. For a comprehensive explanation of how the government’s interest thoroughly fails the compelling interest test, see generally Helen Alvaré, No Compelling Interest: The “Birth Control” Mandate and Religious Freedom, 58 Vill. L. Rev. 379 (2013).

. See Alvaré, supra note 22, at 408-411 for a discussion of the “growing body of scholarship ... indicating that the persistence or worsening of high rates of unintended pregnancy, abortion, and sexually transmitted diseases, and also our nation's high rates of nonmarital births (the chief predictor of female poverty), are the 'logical' result — in economic and psychological terms — of the new marketplace for sex and marriage made possible by increasingly available contraception (in some cases, combined with available abortion).”

. Alvaré, supra note 22, at 399-405.

. Debbie Postlethwaite, et al., A comparison of contraceptive procurement pre-and post-benefit change, 76 CONTRACEPTION 360, 364 (2007).

.Alvaré, supra note 22, at 396-97.

. CDC, “Advance Data No. 350, Dec. 10, 2004: Use of Contraception and Use of Family Planning Services in the United States: 1982-2002”, http://www.cdc.gov/nchs/data/ ad/ad350.pdf (last visited Sept. 3, 2015).

. Alvaré, supra note 22, at 426.